JOURNAL ENTRY AND OPINION
{¶ 1} Appellant Steve Cottrell assigns nine errors challenging his convictions for aggravated murder and three counts of attempted murder with firearm and gang specifications attached.[1]
 {¶ 2} Having reviewed the record and the legal arguments of the parties, we affirm Cottrell's conviction. The apposite facts follow.
 {¶ 3} Cottrell was indicted by the grand jury on one count of aggravated murder and three counts of attempted murder, arising out of Cottrell's altercation with a rival gang. All of the counts had firearm and gang specifications attached.
 {¶ 4} Jermelle Thomas testified he was in a gang called the Tribe, to which Antonio Marshall and Larry and Othello Calloway also belonged. According to Thomas, Cottrell belonged to a rival gang called the Low Valley, which included among others Marcus Dupree.
 {¶ 5} Thomas stated in the early afternoon of May 30, 2001, he and some of the Tribe members were playing basketball at a house near Shaw High School. One of the Tribe members spotted Cottrell and Dupree in the nearby parking lot and warned the others that it appeared something was going to happen. The two groups exchanged words, then Cottrell pulled out a gun and began shooting. The group dispersed and ran. No one was injured.
 {¶ 6} Later that evening, Thomas went to Larry Calloway's girlfriend's house, Regina Cook, where the rest of the group had congregated to admire the new rims that Calloway had put on Antonio Marshall's truck. According to Thomas, as the group was looking at the rims, he heard gunshots. He turned and saw two men about three to four houses away, both shooting. He recognized one of the shooters, who was standing near a light in one of the yards, as Cottrell.
 {¶ 7} Thomas was hit in the backside and sustained severe injuries requiring him to undergo two surgeries and to spend two weeks in the hospital. Larry Calloway sustained a fatal gunshot injury.
 {¶ 8} Antonio Marshall and Othello Calloway both testified to basically the same testimony as Thomas regarding the shooting. However, they never looked to see who was shooting at them.
 {¶ 9} Officers Vargo and Bechtel both testified they responded to a radio dispatch call at around 11:00 p.m. regarding shots fired and one man down. Upon arrival at the scene, they discovered Calloway, dead, on the sidewalk, and Thomas badly injured in the driveway. The officers recovered several .380 shell casings from the scene.
 {¶ 10} Ruben Coleman testified earlier in the day he was playing basketball with some of the Tribe members, but was not there when the shots were fired. Later that night, he was around the corner from Regina Cook's house when he heard about seven to ten shots fired. He said the shots sounded different from each other, indicating that two guns were used. When he returned to Cook's house to see what had happened, he saw Calloway on the ground.
 {¶ 11} Jamillah Marlisa Bennett testified she was at home when she heard shots fired. She looked outside her backyard and saw two boys running in her backyard, wearing black and blue clothes. She recognized one of the boys as Dupree as he had previously attempted to ask her out.
 {¶ 12} Richard Johnson was arrested after he turned himself in and entered a full written confession. He testified at trial in exchange for a voluntary manslaughter plea. According to Johnson, on the day of the murder, he had been at Kisha Tucker's house with Cottrell and Dupree and that Cottrell showed him a .380 automatic gun he had. Later that evening, Johnson borrowed a car from a friend in exchange for crack cocaine. He then picked up Cottrell and Dupree from Kisha Tucker's house and they drove around looking for members of the Tribe. They spotted the group on Elwood. Johnson drove down a side street and parked. Cottrell and Dupree exited the car and walked through backyards on Elwood towards the group. According to Johnson, about ten minutes later, he heard gunshots and saw Cottrell and Dupree running towards the car. When they got into the car, Dupree remarked that he heard one of them yell "ow." Johnson then dropped Dupree and Cottrell off at East 143rd street and left to return the car.
 {¶ 13} Detective Cardilli testified Cottrell approached him on June 1, 2001, and told the detective that he heard he was looking for him. Cottrell gave the officer a statement in which he denied having anything to do with the shootings and claimed to be at his girlfriend's house at the time.
 {¶ 14} Tony Bonds testified he was walking with friends to a friend's house earlier that day, and that Cottrell asked him what he was looking at and then flashed him his gun. Bonds quickly ran into his friend's house.
 {¶ 15} According to the coroner, the bullet removed from Calloway appeared to be a bullet that had ricocheted before hitting Calloway because it was almost split down the middle and flattened. It had entered Calloway's left arm and traveled to his heart.
 {¶ 16} Based on the above evidence, the jury found Cottrell guilty as charged. The trial court, after obtaining a presentence investigation report, sentenced Cottrell to twenty years to life on the aggravated murder count, consecutive to three years for the firearm specification and gang specification; for the attempted murder of Thompson, he received five years consecutive to the aggravated murder charge; and five years each on the remaining attempted murder charges to run concurrent with the rest of the sentence.
 {¶ 17} In his first assigned error, Cottrell argues his Sixth Amendment right to a public trial was violated when the trial court prohibited certain spectators from entering the courtroom during various stages of the trial.
 {¶ 18} The right to a public trial is set forth in the Sixth Amendment of the Constitution of the United States which provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *." Nonetheless, the right to a public trial is not absolute and an order barring spectators from observing a portion of an otherwise public trial does not necessarily introduce error of constitutional dimension.[2] On appeal from such order, the reviewing court is to determine whether the lower court abused its discretion.[3] In Waller v. Georgia[4], the Supreme Court of the United States formulated the standards for courtroom closure into a four-part test:
 {¶ 19} "[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,
 {¶ 20} "[2] the closure must be no broader than necessary to protect that interest,
 {¶ 21} "[3] the trial court must consider reasonable alternatives to closing the proceeding, and
 {¶ 22} "[4] it must make findings adequate to support the closure."
 {¶ 23} A review of the record indicates the trial court closed the courtroom during the hearing on the motion to suppress. We note that the right to a public trial applies equally to pretrial and trial proceedings.[5] Therefore, the closure of the courtroom before or during any part of the trial proceeding, must be narrowly tailored to protect the asserted interest.
 {¶ 24} After carefully reviewing the record here, it appears the trial court closed the courtroom near the conclusion of the hearing on the motion to suppress because of the disruptive behavior of the spectators. The trial court noted it had advised the spectators at the beginning of the hearing to be quiet and that once they had come into the hearing they could not leave. Evidently, the spectators were coming and going from the courtroom, making comments, talking and laughing. The court found such behavior distracting to the court and decided to close the proceedings for the limited time of the hearing.
 {¶ 25} Under these circumstances, where there is an interest in preventing distractions to the trial court and the closure was limited, we do not find the trial court abused its discretion in closing the courtroom at that time.
 {¶ 26} Later during the trial, the public was able to come into the courtroom, but certain spectators were excluded from the courtroom due to the fact they were making threatening remarks and gestures towards the testifying witnesses.
 {¶ 27} This court reviews a trial court's decision to exclude spectators from the courtroom under an abuse of discretion standard: "The trial judge is responsible for the conduct of a trial and has discretion to issue reasonable orders excluding spectators in order to protect or to prevent intimidation of a witness."[6] An abuse of discretion means "more than an error of law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable."[7]
 {¶ 28} We find no abuse of discretion in the trial court's prohibiting these spectators from remaining in the courtroom where their behavior was obviously intimidating to the testifying witness.[8]
 {¶ 29} Cottrell's first assigned error is overruled.
 {¶ 30} In his second assigned error, Cottrell argues the trial court erred by permitting various testimony into evidence.
 {¶ 31} Cottrell first contends the trial court erred by allowing the plea agreement between the state and Richard Johnson to be read into evidence, because the plea agreement refers to a different case number, unrelated to the case. Cottrell contends this constitutes the introduction of prejudicial "other act" evidence in contravention of Evid.R. 404(B), because the jury was apprised that Johnson had done something else wrong.
 {¶ 32} This argument has no merit. The reference to the other case number applies to other acts of Johnson and not Cottrell, and if anything, would affect Johnson's credibility because the jury could see that Johnson had a lot at stake if he did not enter into the deal. As a result, even if there was error, it would hardly have been prejudicial.
 {¶ 33} Cottrell also argues the trial court erred by permitting the state to introduce the videotaped testimony of Jermelle Thomas, depicting him in a hospital bed, because this created sympathy for the victim, which was prejudicial.
 {¶ 34} We find no error. The sole reason the videotaped testimony was admitted was to rebut defense counsel's contention Thomas' testimony that two shooters were at the scene instead of one was fabricated, because he stated in his statement to police there was only one. However, the videotaped testimony indicated Thomas believed there were two shooters, even prior to his giving a written statement.
 {¶ 35} Cottrell argues the trial court also erred by permitting Othello Calloway to testify he had thought his brother, Larry, had gotten into a fight with Cottrell at a party, but because he himself did not witness it, he was not sure. Although we agree that this testimony should not have been admitted, we find any error to be harmless given the evidence presented in support of Cottrell's guilt.
 {¶ 36} Cottrell finally argues that error occurred when the state was permitted to ask witness Joshua Williams if he was afraid to testify against Cottrell. We find this was a legitimate question given the fact Williams had to be forcibly brought to the trial on an arrest warrant before he would testify.
 {¶ 37} Cottrell's second assigned error is overruled.
 {¶ 38} In his third assigned error, Cottrell argues the trial court erred by preventing defense counsel from calling Kisha Tucker and Sabrina Cottrell to testify.
 {¶ 39} We find no error since these witnesses had violated the trial court's separation of witnesses order. The purpose of a separation order is "so that [witnesses] cannot hear the testimony of other witnesses,"[9] and tailor their own testimony accordingly. Thus, a spectator or witness may not tell a prospective witness what has taken place in court if the judge has ordered separation of witnesses.[10]
Exclusion of witnesses is ordinarily a decision within the sound discretion of the trial court. However, where the court seeks to exclude a witness for violating a separation order, there must be a showing that the party calling the witness consented to, connived in, procured or had knowledge of the witness' disobedience. Secondly, the testimony sought to be introduced must be important to the defense such that exclusion of the evidence constitutes prejudicial error.[11]
 {¶ 40} In this case, we do not find support in the record for the claim that defendant connived in or procured disobedience of the separation order. However, the testimony of these witnesses as to what occurred earlier at the basketball game, and as to the relationship between Cottrell and Johnson, would have been merely cumulative. Therefore, no prejudicial error resulted.
 {¶ 41} Cottrell's third assigned error is overruled.
 {¶ 42} In his fourth assigned error, Cottrell argues he was deprived of a fair trial because the prosecutor engaged in misconduct during closing argument by emphasizing Johnson's plea deal, by inferring Johnson was afraid to testify, by telling the jury to send the gangs a message by their verdict, and by stating that defense counsel was telling a story.
 {¶ 43} A prosecuting attorney's conduct during trial does not constitute grounds for error unless the conduct deprives the defendant of a fair trial.[12] The touchstone of a due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.[13] The effect of the prosecutor's misconduct must be considered in light of the whole trial.[14]
 {¶ 44} The alleged improper comments were made during closing argument. A prosecutor is afforded wide latitude in closing arguments and it is within the trial court's sound discretion to determine whether a comment has gone too far.[15] A review of the record indicates that these comments were either made in rebuttal to defense counsel's arguments or were based on evidence in the record. Even if we found they were inappropriate, construing these comments in the context of the entire trial, we cannot find they prejudiced the jury's verdicts given the evidence against Cottrell.
 {¶ 45} Cottrell's fourth assigned error is overruled.
 {¶ 46} In his fifth assigned error, Cottrell argues the trial court erred in instructing the jury as to the required "purpose" for aggravated murder, and that the jury could not consider the lesser included offense of murder, until it found Cottrell was not guilty of aggravated murder. Lastly, Cottrell argues the trial court erred by not preserving in the record the written jury instructions it submitted to the jury.
 {¶ 47} The trial court instructed the jury that "purpose" to murder could be inferred by the use of a deadly weapon. This instruction was in accordance with the Ohio Supreme Court's holding in State v.Stallings. Although Cottrell urges the reversal of Stallings,[16] as an appellate court, we have no power to reverse the Supreme Court.
 {¶ 48} Regarding the trial court's instruction regarding the consideration of the lesser included offense, although the trial court initially instructed the jury that it must first "acquit" Cottrell of aggravated murder prior to considering the lesser included offense of murder, it corrected itself and gave the correct instruction that the jury could consider the lesser included offense, if it could not agree as to Cottrell's guilt regarding the aggravated murder charge.
 {¶ 49} A single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge.[17] We find the trial court's correction sufficiently advised the jury of the correct instruction.
 {¶ 50} Finally, Cottrell argues the trial court erred by failing to preserve its written instructions for the record. According to Cottrell, the court failed to clearly advise the jury regarding the gang specification because it failed to define the offenses under R.C.2923.41(B)(1)(c). The trial court attempted to clarify its instruction by attaching "section C" from R.C. 2923.41 that it read to the jury, to the written instructions it submitted to the jury. Cottrell argues because the trial court failed to preserve the written instructions for the record, there is no way to discern what instruction the jury had before it regarding the gang specification.
 {¶ 51} R.C. 2945.10(G) provides that written charges and instructions shall be taken by the jury in their retirement and returned with their verdict into court and remain on file with the papers of the case. The purpose of this requirement is to ensure that a reviewing court will be able to determine if error exists in the jury charge.[18] While written jury instructions should be preserved as a part of the record, a failure to do so is not per se reversible error.[19] In State v. Mills, this court held where both the state and the defense had an opportunity to review the court's proposed written instructions and neither party identified an error in the written instructions, nor alleged a variation between the court's oral and written instructions previously reviewed, the absence of the court's written jury instructions from the record is not reversible error.
 {¶ 52} Furthermore, the defendant bears the burden of demonstrating that any error in failing to preserve the written instructions resulted in prejudice to the defendant.[20]
 {¶ 53} In this case, Cottrell has failed to demonstrate the failure to include the written instructions in the record resulted in prejudice to him. Although a review of the record indicates that counsel discussed the attachment to the instructions, no objection was made regarding the trial court's attachment. Furthermore, there was adequate evidence introduced to support the gang specification conviction.
 {¶ 54} Therefore, the trial court's failure to preserve the instruction in the record is not reversible error.
 {¶ 55} Cottrell's fifth assigned error is overruled.
 {¶ 56} In Cottrell's sixth assigned error, he argues the trial court erred by failing to give the jury an instruction on alibi and involuntary manslaughter, and failed to give a cautionary instruction regarding "other acts" evidence and the consideration given to the plea agreement that Johnson entered into.
 {¶ 57} We find no error in the trial court's refusal to give an alibi instruction. Cottrell never filed a notice of an alibi and did not present any alibi witnesses. Furthermore, given the evidence in support of Cottrell's guilt, we find any error to be harmless. Where the record supports a finding of guilt beyond a reasonable doubt and appellant cannot show that the result would have been different had the jury been instructed on the defense of alibi, the failure to instruct is not reversible error.[21]
 {¶ 58} Regarding the trial court's failure to instruct the jury on involuntary manslaughter, although involuntary manslaughter is a lesser included offense of aggravated murder,[22] a charge on a "lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense."[23] In the instant case, the evidence of Cottrell shooting at the crowd gathered in the street was indicative of a purposeful killing, which did not warrant an instruction on involuntary manslaughter.
 {¶ 59} Cottrell failed to request cautionary instructions on "other acts" evidence or regarding the plea agreement, and therefore waived any error. However, even construing the matter under the plain error analysis, we find any error by failing to give the instructions to be harmless, given the evidence presented in support of Cottrell's guilt.
 {¶ 60} Cottrell's sixth assigned error is overruled.
 {¶ 61} In his seventh assigned error, Cottrell argues that his convictions for aggravated murder and the gang specification are not supported by sufficient evidence because there was no evidence he intended to shoot Calloway, since Calloway was killed by what appeared to be a ricochet bullet. Cottrell contends the shot was only intended as a warning shot. He also contends there was no evidence that the gang had as one of its primary activities the commission of felonies as required by R.C. 2923.41.
 {¶ 62} A challenge to the sufficiency of evidence supporting a conviction requires the appellate court to determine whether the state met its burden of production at trial.[24] On review for legal sufficiency, the appellate court's function is to examine evidence admitted at trial and determine whether such evidence, if believed, would convince the average person of the defendant's guilt beyond a reasonable doubt.[25] In making its determination, an appellate court must view the evidence in a light most favorable to the prosecution.[26]
 {¶ 63} In the instant case, the evidence indicated that Cottrell, along with Johnson and Dupree, were looking for members of the Tribe gang. Once they spotted the group, Cottrell and Dupree crept up to the crowd where they opened fire, and then ran back to the car.
 {¶ 64} No one testified to the fact that the shot was intended to be a warning shot. Witnesses also testified to the fact that they heard seven to ten shots fired. Certainly, Cottrell should have anticipated that discharging his gun several times into a crowd of people could have the consequences of hitting someone, whether it be a direct or ricochet shot.
 {¶ 65} There was also sufficient evidence presented supporting the gang specification because there was evidence presented that members of the Low Valley gang, including Cottrell, fired upon the Tribe earlier in the day and of course, fired on the Tribe again later in that night, resulting in the death of Calloway. There was also evidence that the gang regularly assaulted members of other rival gangs and threatened to shoot others outside the gang. This evidence was sufficient to support the gang specification.
 {¶ 66} Cottrell's seventh assigned error is overruled.
 {¶ 67} In his eighth assigned error, Cottrell argues the trial court erred in sentencing him to consecutive sentences without making the requisite findings pursuant to R.C. 2929.14(E) and failing to state its reasons in support of imposing consecutive sentences as required by R.C.2929.19(B)(2)(C).
 {¶ 68} In imposing consecutive prison terms for convictions of multiple offenses, the trial court must make certain findings enumerated in R.C. 2929.14(E)(4). R.C. 2929.14(E)(4) states:
 {¶ 69} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 70} "(a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 71} "(b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 72} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 73} Along with making the above findings, the trial court must also state its reasons on the record why it is imposing the consecutive sentence.[27]
 {¶ 74} A review of the sentencing transcript indicates the trial court found that the consecutive sentence was necessary to protect the public and punish the offender and that it was not disproportionate to the conduct or the danger Cottrell posed. In support of this finding, the trial court stated that gunshots were fired, "one young man was killed" and "another one almost killed." The court also found that the harm caused the victims and to the community was so great that a single term would not adequately reflect the seriousness of the conduct.
 {¶ 75} The court also noted Cottrell's lack of cooperation, by refusing to speak to his probation officer when a presentence report was attempted to be obtained. Although this report was stricken by the trial court due to the fact it contained inaccuracies, we do not find that striking the report prevents the court from noting Cottrell's uncooperative behavior for sentencing reasons. After all, as the court noted, it was because of this uncooperative attitude the trial court had limited knowledge of his background for sentencing purposes.[28]
 {¶ 76} We note in the recent case of State v. Comer[29] the Ohio Supreme Court has stated, "While consecutive sentences are permissible under the law, a trial court must clearly align each rationale with the specific finding to support its decision to impose consecutive sentences."[30] We do not interpret this to mean the trial court must directly correlate each finding to each reason or state a separate reason for each finding. Instead, we interpret it to mean the reasons must be stated sufficiently on the record so that it may be determined whether the findings are supported by the trial court's reasoning. In so interpreting the case, we note the holding of the case concerned the trial court's duty to set forth its reasons orally at the hearing rather than later in a written journal entry.
 {¶ 77} We find the findings and reasons set forth by the trial court indicate the trial court complied with the requisite statutes in imposing consecutive sentences.
 {¶ 78} Cottrell also argues the trial court erred by not considering whether the sentence was proportional with other sentences for similar crimes.
 {¶ 79} This court in State v. Bolton[31] distinguished the proportionality finding pursuant to R.C. 2929.14(E)(4) and that required by R.C. 2929.11(B) as follows:
 {¶ 80} "While R.C. 2929.14(E)(4) demands the trial court make findings on the record to evidence the proportionality of consecutive sentences, R.C. 2929.11 entails no such burden. The reason for this disparity is clear from Senate Bill 2's construction. As we previously noted, R.C. 2929.11 sets forth Ohio's purposes and principles of felony sentencing, which are to be implemented by sentencing courts via application of sections such as R.C. 2929.14(E)(4). R.C. 2929.11 does not require findings; rather it sets forth objectives for sentencing courts to follow."[32]
 {¶ 81} We conclude since the trial court was not required to make any findings, it complied with R.C. 2929.11(B), and because nothing exists in the record that demonstrates the trial court failed to consider the purposes and principles of R.C. 2929.11 in sentencing Cottrell, the trial court's sentencing him to consecutive sentences was proportional to the seriousness of Cottrell's conduct.
 {¶ 82} Cottrell's eighth assigned error is overruled.
 {¶ 83} In his ninth assigned error, Cottrell contends his counsel was ineffective because his counsel failed to object to jury instructions given by the trial court and failed to request certain instructions.
 {¶ 84} Given our disposition of the fifth and sixth assigned errors, Cottrell's ninth assigned error is moot. App.R. 12(A)(1)(c).
Judgment affirmed.
Kenneth A. Rocco, A.J., Concurs; Diane Karpinski, J., Concurs inPart and Dissents in Part. (See attached Concur/Dissent opinion.)
 APPENDIX
 ASSIGNMENTS OF ERROR
 {¶ 85} "I. Appellant's sixth amendment right to a public trial was violated when the trial court ejected all of the spectators from the courtroom and when the deputy sheriff refused to permit spectators to enter the courtroom."
 {¶ 86} "II. Appellant's right to due process of law under the 14th Amendment was violated when the trial court permitted the state to introduce other acts testimony and other unfairly prejudicial evidence."
 {¶ 87} "III. The trial court violated appellant's Sixth Amendment rights when it prohibited him from calling defense witnesses."
 {¶ 88} "IV. The prosecutor's remarks during closing argument deprived appellant of a fair trial."
 {¶ 89} "V. The trial court's inaccurate jury instructions deprived appellant of his due process right to a fair trial."
 {¶ 90} "VI. The trial court's failure to instruct the jury on alibi, involuntary manslaughter and the use to be made of other acts testimony and the plea agreement deprived appellant of a fair trial."
 {¶ 91} "VII. Appellant was denied his liberty without due process of law as conviction were not supported by sufficient evidence."
 {¶ 92} "VIII. Appellant has been deprived of his liberty without due process of law by the consecutive sentences imposed on him as said sentences do not comport with Ohio's new sentencing structure."
 {¶ 93} "IX. Trial counsel's deficient representation denied appellant his constitutional right to effective assistance of counsel."
[1] See Appendix.
[2] State v. Brown (Nov. 25, 1998), Cuyahoga App. No. 73060, citing toBrown v. Kuhlmann (C.A. 2, 1998), 142 F.3d 529; Douglas v. Wainwright
(C.A. 11, 1984), 739 F.2d 531, cert. denied, 469 U.S. 1208.
[3] United States v. Rios Ruiz (C.A. 1, 1978), 579 F.2d 670, 674;United States v. De Los Santos (C.A. 5, 1987), 810 F.2d 1326, 1332;United States v. Eisner (C.A. 6, 1976), 533 F.2d 987, 994 (en banc);United States v. Lucas (C.A. 8, 1991), 932 F.2d 1210, 1216-1217 cert. denied, 502 U.S. 949, 112 S.Ct. 399, 116 L.Ed.2d 348; United States v.Hernandez (C.A. 9, 1979), 608 F.2d 741. See, also, State v. Cockshutt
(1989), 59 Ohio App.3d 87, 89 (trial judge has discretion to issue reasonable orders excluding spectators in order to prevent intimidation of a witness).
[4] (1984), 467 U.S. 39, 48.
[5] State v. Unger (1986), 28 Ohio St.3d 418, 421.
[6] State v. Bayless (1976), 48 Ohio St.2d 73, 109, vacated in part on other grounds (1978), 438 U.S. 911.
[7] Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
[8] Although there is an allegation that the trial court prevented certain spectators from entering the courtroom at the start of trial, the court made clear on the record that it did not preclude the spectators, but that the deputy sheriff had prevented particular people from entering the hallway due to an earlier altercation in the hallway between rival gang members, and that the spectators were informed, as long as certain perimeters set forth by the deputy were complied with, the spectators could come in.
[9] Evid.R. 615.
[10] State v. Waddy (1992), 63 Ohio St.3d 424; State v. Spirko
(1991), 59 Ohio St.3d 1, 14.
[11] State v. Smith (1990), 49 Ohio St.3d 137, 142.
[12] State v. Keenan (1993), 66 Ohio St.3d 402-405; State v. Gest
(1995), 108 Ohio App.3d 248, 257.
[13] Smith v. Phillips (1982), 455 U.S. 209.
[14] State v. Durr (1991), 58 Ohio St.3d 86, 94; State v. Maurer
(1984), 15 Ohio App.3d 239, 266.
[15] State v. Benge (1996), 75 Ohio St.3d 136.
[16] (2000), 89 Ohio St.3d 280.
[17] State v. Jalowiec (2001), 91 Ohio St.3d 220, 230-231.
[18] State v. Smith (1993), 87 Ohio App.3d 480.
[19] State v. Mills (Dec. 9, 1999), Cuyahoga App. No. 74700.
[20] State v. Warner (1990), 55 Ohio St.3d 31, fn. 19; State v.Hudson, Cuyahoga App. No. 79010, 2002-Ohio-1408; State v. Cruz (Jan. 27, 2000), Cuyahoga App. No. 75723.
[21] State v. Sims (1982), 3 Ohio App.3d 331, 335. See, also, State v.McClain, Cuyahoga App. No. 77740, 2002-Ohio-2349; State v. Griffin, (Aug. 25, 1988), Cuyahoga App. No 54238; State v. Wylie (Oct. 25, 1984), Cuyahoga App. No. 48012; State v. Mitchell (1989), 60 Ohio App.3d 106,108.
[22] State v. Thomas (1988), 40 Ohio St.3d 213.
[23] State v. Thomas, 40 Ohio St.3d 213, paragraph two of the syllabus; State v. Kidder (1987), 32 Ohio St.3d 279.
[24] State v. Thompkins (1997), 78 Ohio St.3d 380.
[25] Id.; State v. Fryer (1993), 90 Ohio App.3d 37.
[26] Id. at 43.
[27] State v. Anderson (2001), 146 Ohio App.3d 427; State v. McGee, Cuyahoga App. No. 77463; 2001-Ohio-4238.
[28] Transcript at 1930.
[29] 99 Ohio St.3d 463.
[30] Id. at 468.
[31] Cuyahoga App. No. 80263, 2002-Ohio-4571.
[32] Id. at P20. See, also State v. Gooden, Cuyahoga App. No. 81320, 2003-Ohio-2864, at P82; State v. Pempton, Cuyahoga App. No. 80255, 2002-Ohio-5831 at P10.